## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-60698-CIV-MARRA/JOHNSON

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

vs.

ZACHARIAH P. ZACHARIAH,
*et al.*,

       Defendants.
_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came on for non-jury trial before the undersigned United States

Magistrate Judge by consent of the parties.  The trial was held as to Defendant Zachariah

P. Zachariah only, as former Defendants Dr. M. Zachariah and Dr. Nassberg consented

to the entry of final judgments against them without admitting or denying the allegations of

the Complaint (except as to subject matter jurisdiction and personal jurisdiction)(D.E. #s

91-92).  The trial lasted approximately twelve non-consecutive days, commencing on

August 24, 2010 and ending on October 8, 2010.  Based upon the evidence and testimony

submitted, and considering the relevant statutory provisions and case law, this Court finds

in favor of the Defendant, Zachariah P. Zachariah, and against the Plaintiff, the Securities

and Exchange Commission. A final judgment to this effect shall be entered by separate

order simultaneously herewith.  Pursuant to the requirements of Federal Rule of Civil

Procedure 52, the following findings of fact and conclusions of law are hereby issued.

## I.  PROCEDURAL BACKGROUND

1.      The Securities and Exchange Commission (the "SEC") filed its One-Count Complaint for injunctive and other relief on May 12, 2008 (D.E. #1), alleging insider trading in violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), 17 C.F.R. §240.10b-5, by Defendant Dr. Zachariah P. Zachariah ("Dr. Zachariah").  The Complaint alleges that Dr. Zachariah traded on inside information and tipped his brother Dr. Mammen P. Zachariah ("Dr. M. Zachariah") and his friend Dr. Sheldon Nassberg ("Dr. Nassberg") with inside information. The inside information allegedly traded on concerns two separate series of stock  purchases related to two publicly held corporations, IVAX and CSC during 2005.

2.      The Court has jurisdiction over this action pursuant to Sections 21(d) and 21A of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1.

3.      Dr. Zachariah denied the SEC's allegations and the matter proceeded to a bench trial beginning on August 24, 2010.

## II.  FINDINGS OF FACT

### A.   BACKGROUND

### *Dr. Zachariah P. Zachariah*

4.      Dr. Zachariah, age 61, resides in Sea Ranch Lakes, Florida.  He is a prominent cardiologist and since 1976 has worked in the Holy Cross Hospital. *See* Trial Transcript ("TT"), p. 1444.  He has served as the Director of Cardiology, and as a Member of the Board of Trustees at Holy Cross Hospital in Fort Lauderdale, Florida. *Id.* at pp. 1444-1446.

5.      Dr. Zachariah has served as a member of the Florida Board of Medicine, the body that licenses and disciplines healthcare providers in Florida, and has served as that Board's Chairman.  Dr. Zachariah has also served as a member of the Florida Board of Governors, the governing body of all public universities in Florida.  Among other public service and charitable work, Dr. Zachariah has also served as the Chairman of the Governor's Task Force on Obesity and as a member of the Board of Trustees of Nova University. *Id*. at pp. 1442-1446.

### *Dr. Zachariah's Investing History and Experience*

6.      Dr. Zachariah has been a practicing cardiologist for over 30 years. He is renowned in his field and well respected by his peers and patients alike. In 2005 he had a very substantial net worth and between his medical practice and consulting work earned an income in excess of $800,000.   *Id*. at pp. 1244-1245, 1444.

7.      Dr. Zachariah routinely invests in stocks, and has been doing so on-and-off for over 25 years.  In addition to having had funds managed by others, and maintaining accounts at various brokerage firms in the past, Dr. Zachariah also maintained Charles Schwab online brokerage accounts to conduct his own stock trading. *Id*. at pp. 1235-1237.

8.      In the last 15 years prior to the trial, particularly during the early 2000s, Dr. Zachariah lost over $20 million dollars in the stock market. *Id*. at pp. 1234-1236.  Even after the great loss he suffered in 2001 and 2002, Dr. Zachariah continued up through and including the 2004 and 2005 time period in question, to invest heavily in the stock market, though from a dollar standpoint not to the extent he did previously. *Id*. at pp. 1235-1236

9.      In 2004 and 2005 in his Charles Schwab brokerage accounts, Dr. Zachariah

maintained balances of anywhere between $1 million to more than $7 million. *See* Defendant's Trial Exhs. 5 & 9.

10.     Dr. Zachariah was a very active trader in all types of stocks.  He often invested substantial amounts in individual stocks and frequently traded in-and-out of stock positions.  *See* TT at pp. 1173-1174.  For example, in 2004 and 2005, he made the following purchases of individual stocks in his Charles Schwab accounts: 3M ($1,287,112), AIG ($1,351,465), Cendant ($302,779), CCA ($464,903), DuPont ($488,273), El Paso ($128,368), Pfizer ($419,608) and Tyco ($531,677). *See* Defendant's Trial Exhs. 5 & 9.

11.     Dr. Zachariah also has a history of trading the stock of companies, like CSC, in the corrections industry, such as GEO and Correctional Corporation of America. *Id*. And likewise has a history of trading the stock of companies, like IVAX, in the pharmaceutical industry. *Id*.; TT at pp. 1446-1449, 1454-1455.

## B.     THE IVAX PURCHASES

### *Dr. Zachariah's Initial Purchases of IVAX*

12.     IVAX, headquartered in Miami, Florida, is a pharmaceutical company whose stock used to trade on the American Stock Exchange.  The Chairman and CEO of IVAX was Dr. Phillip Frost.  Dr. Frost had previously served as the co-vice chairman of the American Stock Exchange.  *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 1.

13.     Dr. Zachariah had a history of actively trading in large quantities of IVAX's stock before he became a member of its board of directors.  In November and December 2004, he purchased 40,000 shares of IVAX.  On January 3, 2005, he purchased an additional 10,000 shares, for a total of 50,000 shares.  He sold all of the shares he held a

short time later in February and March 2005 for a profit of approximately $54,000. After selling all of his shares of IVAX, Dr. Zachariah again purchased 5,000 shares of IVAX on April 12, 2005. *See* Defendant's Trial Exs. 5 & 9. These trades all took place <u>before</u> Dr. Zachariah became a director of IVAX.

14.     The SEC does not allege that there was anything improper about any of these purchases or sales of IVAX shares by Dr. Zachariah.

### *Dr. Zachariah Becomes a Director of IVAX*

15.     Dr. Zachariah was invited to join the board of IVAX by Dr. Phillip Frost due to Dr. Zachariah's medical expertise in an area where IVAX was developing drugs and due to his business experience. *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 1. Dr. Zachariah became a director and attended his first board meeting on April 29, 2005. *See* Plaintiff's Trial Ex. 8.

16.     Prior to becoming a director of IVAX, Dr. Zachariah had served only briefly as a director of a small public company called CyberCare. *See* TT at pp. 1448-1450. IVAX was Dr. Zachariah's first substantive experience as a public company director.

17.     Corporate Minutes from the first IVAX Board meeting that Dr. Zachariah attended on April 29, 2005 reveal there was no discussion of a potential acquisition of IVAX by Teva Pharmaceuticals Industries Ltd. ("Teva"), an Israeli pharmaceutical company. *See* Plaintiff's Trial Ex. 8.

18.     This fact was confirmed by the testimony of other directors and officers who attended the April 29 meeting and credibly testified that there was nothing of particular note discussed at the meeting regarding potential transactions by IVAX. IVAX Board Member

and Director Dr. Betty Amos ("Dr. Amos") credibly testified that nothing stood out during or immediately after the April 29th meeting of any significant opportunity being discussed. *See* TT at pp. 266-267.  Mr. Steve Rubin, the General Counsel of IVAX, likewise testified in credible fashion in response to the SEC's questions that "there is nothing that rises to the level of material information," in the April 29 meeting minutes.  *See* TT at p. 570.  Dr. Phillip Frost similarly credibly testified that IVAX was always considering mergers or acquisitions or being acquired and "these were all very preliminary and it was just by way of keeping the board informed about our thought processes and the possibilities that were out there being considered."  *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 7. The Court specifically finds the testimony of each of these witnesses credible.

19.     Lending further credibility to witness testimony that there was no discussion had at the April 29, 2005 meeting regarding a potential acquisition of IVAX by Teva, is the fact  there was no special blackout period put in place by the General Counsel of IVAX after the Board meeting that would prevent officers and directors from buying or selling IVAX stock. *See* TT at p. 673.  And indeed, several officers and directors did just that.  *See* Defendant's Trial Exs. 28D, 29A, 29B, 29C, 29D.

### *Dr. Zachariah's May 4, 2005 Purchase of IVAX Stock*

20.     At the April 29 Board meeting, IVAX provided its directors with a packet of material that included a draft of IVAX's Proxy Statement, which was eventually sent to all shareholders with its May 2, 2005 Notice of its Annual Shareholders Meeting.  *See* Plaintiff's Trial Ex. 66.  The Proxy Statement listed all of the board members and their holdings in IVAX stock as follows:

| Director | # of shares |
|---|---|
| Betty G. Amos | 21,250 |
| Mark Andrews | 131,562 |
| Ernst Biekert, Ph.D. | 45,313 |
| Paul L. Cejas | 46,875 |
| Frank C. Condella, Jr. | 143,750 |
| Jack Fishman, Ph.D. | 4,388,904 |
| Neil Flanzraich | 3,480,430 |
| Phillip Frost, M.D. | 44,467,490 |
| Jane Hsiao, Ph.D. | 9,861,577 |
| Richard Krasno | 5,968 |
| David A. Lieberman | 27,750 |
| Richard C. Pfenniger, Jr. | 247,893 |
| Bertram Pitt, M.D. | 50,000 |

*See* Plaintiff's Trial Ex. 193A at p. 11.

21.     Dr. Zachariah reviewed either the draft Proxy Statement or a similar document from IVAX containing this information.  Dr. Zachariah testified that, after seeing the substantial number of shares held by his then fellow directors, he resolved to increase the size of his holdings to be more in line with those of his fellow directors and to show his commitment to the company.  *See* TT at pp. 1420-1422, 1456-1457. He testified that he originally planned to purchase 100,000 shares over time. *See* TT at pp. 1422, 1457, 1467.

22.     Dr. Zachariah's stated decision to purchase a greater quantity of IVAX stock was consistent with similar decisions made by other directors of IVAX.  For example, Richard Krasno, who also became a director in early 2005, credibly testified that he owned some IVAX stock before joining the board and bought some immediately after joining the board "because [he] thought it was an important thing for a director to have a stake in the corporation that he served on the board."  *See* Plaintiff's Trial Ex. 367 (Krasno Summary).  Similarly, Bertram Pitt credibly testified that when he joined the IVAX board sometime between 2001 and 2002, he bought some IVAX stock, because "that was one of the suggestions, that one does that if you join the board, and I did it and I may have bought stock additionally one or two times after that."

7

*See* Plaintiff's Trial Ex. 368 (Pitt Summary).  Similarly, Dr. Betty Amos testified in credible fashion that she bought stock in IVAX shortly after becoming a member of the board of directors.  *See* TT at pp. 263-264.

23.     According to the testimony of Steve Rubin, the General Counsel for IVAX at the time, it was not unusual for new members of the board to purchase stock.  *Id.* at pp. 622-23.  The Court finds Mr. Rubin's testimony credible and consistent with the testimony of the other key witnesses in this case and with the evidence of record.

24.     On May  4, 2005, Dr. Zachariah proceeded to purchase 30,000 shares of IVAX in his Charles Schwab account, bringing his holdings to a total of 35,000 shares.  *See* Defendant's Trial Ex. 9.

25.     Credible testimony from Dr. Zachariah confirms that at or around the same time, Dr. Zachariah received a draft SEC form from IVAX that did not correctly reflect his holdings in IVAX stock.  After making the purchase of 30,000 shares, Dr. Zachariah contacted IVAX's legal department to report that his total holdings were now 35,000 shares.  IVAX proceeded to file an SEC Form 3 showing Dr. Zachariah's initial holdings as 5,000 shares, and filed an SEC Form 4 (Statement of Changes in Beneficial Ownership) to disclose the purchase of the 30,000 subsequently purchased shares.  *See* Plaintiff's Trial Exs. 21 & 22; TT at p. 1460.

26.     According to the testimony of Dr. Zachariah, which the Court specifically finds to be credible, during the course of reporting the above information to IVAX, he came to understand from someone in IVAX's legal department that he was required to report any trades in IVAX stock to IVAX within 24 hours of making them.  *See* TT at p. 1461.

27.     Dr. Zachariah credibly testified and evidence of record confirms the fact that at the time of his May 4, 2005 purchase, his office had not yet been provided with a copy of IVAX's Insider Trading Compliance Procedures nor in any other manner been informed of IVAX's insider trading compliance procedures, which were "pre-clearance" in nature.  *See* TT at pp. 1460-1461; Plaintiff's Trial Ex. 50.

28.     Indeed, undisputed evidence of record reveals that it was not until May 6, 2005, two days <u>after</u> Dr. Zachariah's May 4, 2005 purchase of 30,000 shares of IVAX stock, that the IVAX Policy Packet was delivered to Dr. Zachariah's office. *See* Defendant's Trial Ex. 23. Although evidence reveals that the Policy Packet was sent to Dr. Zachariah's office on May 6, 2005, Dr. Zachariah denies ever having seen the packet or any of the documents contained therein until after the instant litigation ensued, which testimony the Court specifically finds to be credible and consistent with other evidence of record. *See* TT at pp. 1462-1466; Defendant's Trial Ex. 30.

29.     Undisputed evidence also reveals that no material, non-public information was disclosed at the April 29, 2005 Board Meeting that Dr. Zachariah attended and no special blackout period put into place after such meeting that would prevent officers and directors from buying or selling IVAX stock. *See* TT at pp. 266-267, 570, 673; Plaintiff's Trial Ex. 8

30.     On May 5, 2005, the very next day after Dr. Zachariah purchased shares, his fellow director Dr. Krasno purchased 5,000 shares.  *See* Defendant's Trial Ex. 29A.  The SEC has made no claim that Dr. Krasno's purchase was improper in any way and has not taken any action against Dr. Krasno.

### *Dr. Zachariah's July 6, 2005 Purchase of IVAX Stock*

31.      On July 6, 2005, shortly after returning from a vacation over the July 4th weekend, Dr. Zachariah decided to purchase additional IVAX shares.  Dr. Zachariah testified in credible fashion that he was prompted to buy additional shares at this time after seeing either the revised Proxy Statement or similar information from IVAX and again taking note of the shareholdings of his fellow directors.  *See* TT at pp. 1466-1467.

32.      According to the credible testimony of Dr. Zachariah, consistent with what he now understood the company's policy to be, on July 6, 2005, he had his secretary call IVAX at 9:23 a.m. to set up a call between Dr. Zachariah and Mr. Steve Rubin, the General Counsel of IVAX, so that Dr. Zachariah could report the purchases he planned to make that day.  *See* Plaintiff's Trial Ex. 32; Defendant's Trial Ex. 17; and TT at p. 1468.

33.      Dr. Zachariah proceeded to purchase a total of 35,000 additional shares of IVAX that afternoon in four orders in his Charles Schwab account.  *See* Defendant's Trial Ex. 9; TT at pp. 1468-1469.

34.      The number of shares purchased (35,000) equaled the number he already owned and is consistent with his testimony that after seeing the stock holdings of his fellow Board Members, it was his intention to purchase a total of 100,000 shares over time.  *See* TT at pp. 1422, 1457, 1467.  Dr. Zachariah had substantial available cash, including $2 million sitting in a money market fund, at the time he made the purchase.  Thus, despite Dr. Zachariah's ready access to available cash he used only a relatively small portion of that cash to make the purchase.  *See* Defendant's Trial Ex. 9;  TT at pp. 1382-1383.

35.     Immediately after purchasing shares at 2:04 p.m., telephone records for Dr. Zachariah's office show that he again called Mr. Rubin's office line at 2:11 p.m. (for 0.5 minutes) and at 2:15 p.m. (for 0.5 minutes).  *See* Defendant's Trial Ex. 17.  During one of these calls, Dr. Zachariah left a message for Mr. Rubin to call him back.  *See* TT at p. 1468.

36.     Telephone records show that Mr. Rubin returned Dr. Zachariah's call at 4:24 p.m. to the Holy Cross Hospital number, and that the two spoke again at 4:58 p.m. on Dr. Zachariah's cell phone. *See* Defendant's Trial Ex. 14.

37.     According to the credible and consistent testimony of both Dr. Zachariah and IVAX counsel, Mr. Rubin, when they spoke later that day, Dr. Zachariah advised Mr. Rubin of his purchases earlier that afternoon.  Mr. Rubin told Dr. Zachariah that the purchase had been made during a "blackout period" (a period beginning two weeks prior to the end of a quarter and continuing until the first business day after publication of IVAX's earnings for that quarter, during which directors and officers were prevented from buying or selling shares). At that time Mr. Rubin asked Dr. Zachariah whether he possessed any inside information prior to making the purchases, and Dr. Zachariah said that he did not.  *See* TT pp. 635-636; 1470.  At trial, Mr. Rubin explained to the Court that the "blackout period" was in any event an "informal" internal policy of IVAX's and not a legal requirement whose violation would in one way or another be indicative of insider trading. *See* TT at pp. 539, 641.

38.     Mr. Rubin credibly testified that after explaining to Dr. Zachariah that he had purchased shares in IVAX during a "blackout period," he asked Dr. Zachariah to call his broker and ask him if he could "unwind" the transaction or "reverse the trade." *See* TT at pp. 636, 1470-1472.  Consistent with the foregoing, Dr. Zachariah testified in credible fashion that he

11

followed Mr. Rubin's instructions and called Charles Schwab and was told that he could not unwind or otherwise reverse a trade that had been executed. *See* TT at pp. 1470-1472. A Charles Schwab witness, Mr. Alex Haywood, testified at the trial and in testimony the Court finds to be credible, confirmed that the firm would not "bust" an executed trade at a customer's request. *See* TT at pp. 1553, 1590.

39.     Records for Dr. Zachariah's office phone confirm that he made a 2.1 minute call to Charles Schwab (1-800-242-3366) at 5:06 p.m. on July 6, shortly after his calls with Mr. Rubin, and that he called Mr. Rubin again on his cell phone at 5:12 p.m. *See* Defendant's Trial Ex. 14, 17.  In addition, records for Dr. Zachariah's cell phone show that he called Charles Schwab's local office (954-468-2408) the next morning at 9:26 a.m. in a call that lasted 13 minutes. *See* Defendant's Trial Ex. 13.

40.     These records are consistent with the testimony of Dr. Zachariah and Mr. Rubin who both testified, in statements the Court finds credible, that after making the above phone calls Dr. Zachariah called Mr. Rubin that same morning and told him that he could not unwind the trade.  Whereupon, Dr. Zachariah offered to sell the shares right away, which would have been at a small loss, but Mr. Rubin told Dr. Zachariah that while the decision was ultimately up to him, he should not do so.  *Mr. Rubin*:  "I told him not to sell the stock, but I told him it was up to him what he wants to do with it."  *See* TT at p. 637.  Additional credible testimony from Dr. Zachariah and Mr. Rubin reveals that Dr. Zachariah then proceeded to ask whether he should transfer the stock to his brother so that he would not benefit from it, but Mr. Rubin told him not to do that either and Dr. Zachariah complied.  *See* TT at pp. 637, 1387, 1472.

41.     In further compelling and credible testimony, Mr. Rubin testified that following the above conversations with Dr. Zachariah, on either the same day or the day after, he called Dr. Frost to allay any concerns that Dr. Zachariah may have obtained inside information from Dr. Frost before executing the subject IVAX trades. *See* TT at pp. 639-640.   In that conversation, Dr. Frost confirmed to his General Counsel that he had <u>not</u> said anything to Dr. Zachariah about the potential transaction with Teva.  *See* TT at p. 640.

42.     Mr. Rubin testified that after speaking with both Dr. Zachariah and Dr. Frost independently, it was his belief that Dr. Zachariah's violation of IVAX's internal procedures was inadvertent and he had no reason to believe that Dr. Zachariah had engaged in insider trading. *See* TT at pp. 640-643.

43.     Ultimately, Dr. Zachariah took no further action with respect to the IVAX stock he had purchased on July 6. *See* TT at p. 1472.

### *Dr. Frost's July 6, 2005 Meeting With Teva*

44.     The evidence reveals that IVAX and Teva had been holding on-again-off-again discussions about a possible merger for several years.   The discussions were handled primarily by Dr. Frost.   None of the talks had resulted in a transaction being completed.   *See* Plaintiff's Trial Ex. 363 (Frost Summary) at pp. 2-3.

45.     The evidence also reveals that unbeknownst to Dr. Zachariah, on July 6, 2005, Dr. Frost attended a meeting in New York City with Teva representatives.   At that meeting, the Teva representatives indicated that they might be willing to pay $26 per share to acquire IVAX. *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 2.   Dr. Frost testified that up until a day or two before the deal was eventually announced, he was not sure that they would have a deal

with Teva. *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 3. According to Dr. Frost, there

was never certainty until the deal with Teva was actually announced on July 25, 2005. *Id.* The

Court finds the foregoing testimony to be credible and consistent with the testimony of other

key witnesses and evidence of record.

46.     According to the credible testimony of Mr. Steve Rubin, only a small number of

people knew that the meeting with Teva in New York City was going to occur on July 6, 2005,

and Dr. Zachariah was not one of them.  *See* TT  at p. 640.

47.     At trial Dr. Frost testified to the actions he took immediately following the July 6,

2005 meeting with TEVA representatives. The Court finds the following testimony of Dr. Frost

regarding his post-meeting actions to be credible and consistent with the testimony of other key

witnesses and evidence of record. Dr. Frost testified that after he finished with the meeting in

New York, he boarded a private plane to fly to London to meet with representatives of an

Indian pharmaceutical company that IVAX was considering acquiring.  *See* Plaintiff's Trial Ex.

363 (Frost Summary) at p. 5.

48.     During the flight Dr. Frost placed a number of telephone calls from a phone on

the private plane by calling his office at IVAX (ext. 6001) and having his office then place calls

for him.  Dr. Frost testified that he did not recall ever receiving any calls on the plane phone,

only placing calls from it.  *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 5.

49.     Dr. Frost testified that his recollection of the events following the meeting is

consistent with his actions following similar meetings.  According to Dr. Frost, following the

meeting with Teva in New York, his "approach to the board would have been to call, perhaps,

a few key members just to bring them up to date about the discussions, but [he] didn't think it

was definitive at that point." After the meeting, Dr. Frost "thinks he called [his] inner group [at IVAX] and told them about the discussions." *See* Plaintiff's Trial Ex. 363 (Frost Summary) at pp. 4-5. Dr. Frost testified that Dr. Zachariah was not a member of his "inner circle" at IVAX. *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p.5.

50.     Dr. Frost's testimony regarding Dr. Zachariah not being part of his IVAX "inner circle" is consistent with the credible testimony of Mr. Steve Rubin who also testified that Dr. Zachariah was not a part of the "core group" of officers and directors at IVAX. *See* TT at p. 615.

51.     Dr. Frost's trial testimony is also consistent with his testimony at deposition. At the deposition taken closest in time to the events at issue, Dr. Frost, when asked whether he had called Dr. Zachariah from his plane on July 6, 2005, to tell him about the discussions with Teva, testified: "I don't believe so. I don't, I don't remember that." *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 5. It is also consistent with the credible testimony of Dr. Zachariah, who testified at trial that he never spoke to anyone from IVAX including Dr. Frost about Teva's offer to by IVAX stock prior to his IVAX stock purchase on July 6, 2005, and that the first time he learned that IVAX received an offer from Teva, or was even in discussions with them, was at the special board meeting five days later on July 11, 2005. TT at pp. 1470, 1473.

52.     The SEC nonetheless contends that Dr. Frost spoke to Dr. Zachariah when he made a call from the private plane at 1:59 p.m. to his IVAX office and then had a call placed from his office line to Dr. Zachariah's office line at 2:02 p.m. Viewing the telephone toll records as a whole, however, does not lend support to this contention. The telephone toll records indicate that the call at 2:02 p.m. to the main line for Dr. Zachariah's medical offices lasted 3

minutes and 18 seconds.  *See* Plaintiff's Trial Exs. 28 & 54.  However, there was no witness testimony at trial as to who called Dr. Zachariah's office from Dr. Frost's office, who answered the phone at Dr. Zachariah's office when the call was received, and what, if anything, was said by the individuals on the call.  And according to the testimony of Dr. Zachariah which the Court finds credible and consistent with testimony from other key witnesses, Dr. Zachariah never received a phone call from Dr. Frost on the day in question.

53.     In addition, the telephone records from the plane phone show that another call was placed at 2:04 p.m. from the plane to Dr. Frost's office at IVAX.   These records reveal this call is being made at the same time that the 2:02 p.m. call between Dr. Frost's IVAX office and Dr. Zachariah's office is allegedly taking place.  The 2:04 p.m. call lasted 2 minutes.  *See* Plaintiff's Trial Exs. 28 & 54.

54.     Dr. Zachariah's medical office has a receptionist that answers any incoming phone calls and takes the caller's information to determine how the call should be handled. If the call is for Dr. Zachariah, it is transferred to his personal secretary who in turn determines who the caller is and then attempts to locate Dr. Zachariah, who may be seeing patients or performing procedures, to see if he can take the call.  *See* TT at pp. 1475-1476.

55.     The phone records from Dr. Zachariah's office also show that Dr. Zachariah's office called Dr. Frost's office back at 2:11 p.m. (lasting .7 minutes), and again at 2:15 p.m. (lasting 2.4 minutes).  *See* Plaintiff's Trial Ex. 30; Defendant's Trial Ex. 17.

56.     The reasonable inference from this pattern of calls is that Dr. Frost and Dr. Zachariah did not speak to each other on the phone call placed from Dr. Frost's office at 2:02 p.m.  While this call is in progress, Frost is making another call at 2:04 p.m. from the same

plane phone, suggesting that he had been dropped or disconnected from the 2:02 p.m. call. *See* Plaintiff's Trial Exs. 28 & 54.  He could not have been on two calls simultaneously.

57.      In addition, it would be illogical that Dr. Zachariah's office appears to be trying to call Dr. Frost's office back in a call at 2:11 p.m. and again in a call at 2:15 p.m. if the two men actually had already spoken just minutes earlier.  Rather, this pattern is consistent with the two <u>not</u> speaking to each other in the first call at 2:02 p.m., and with Dr. Zachariah's office trying to return the call or message from Dr. Frost in the two calls at 2:11 p.m. and at 2:15 p.m. *See* Plaintiff's Trial Exs. 28 & 54.

58.      Dr. Zachariah is not the only director that Dr. Frost apparently had difficulty reaching on that day.  Telephone records show that Dr. Frost placed five separate calls to IVAX Board Member/Director Dr. Betty Amos from the airplane, but Dr. Amos testified that he only reached her on the final call.  *See* Plaintiff's Trial Ex. 54;  TT  at p. 271.

59.      Further under-cutting the SEC's argument is the fact that Trading records from Charles Schwab show that Dr. Zachariah's first purchase of IVAX shares on July 6, 2005 took place at 2:04 p.m.  This is significant, because the reasonable inference from the telephone toll records is that Dr. Zachariah and Dr. Frost did not speak before that time (or at all on July 6, 2005).  Accordingly, based on the evidence and credible testimony presented, the Court finds that Dr. Frost did not convey any information about the meeting with Teva to Dr. Zachariah prior to Dr. Zachariah's purchase of IVAX shares at 2:04 p.m.  *See* Plaintiff's Trial Ex. 281.

60.      The SEC argued in its closing arguments that the time indicators on the IVAX phone records were off by 3 minutes from the time indicators for the airplane phone and for

Dr. Zachariah's office phone.  However, no witness, whether from one of the phone service providers or otherwise, testified to reconcile the apparent discrepancies in the phone records. This simply underscores the unreliability of this phone record evidence for use in drawing the inferences that the SEC seeks to draw.

61.     Credible testimony from IVAX directors Betty Amos, Richard Krasno and Bertram Pitt establishes that they were advised of the New York discussions with Teva by Dr. Frost on July 6, 2005 pursuant to a phone call from Dr. Frost from his plane.  *See* TT at pp. 246-253; Plaintiff's Trial Ex. 367 (Krasno Summary) at p. 2; Plaintiff's Trial Exh. 368 (Pitt Summary) at p. 2.  Each of these directors was considered by Dr. Frost to be part of his "inner circle" (in the case of Amos and "borderline" in the case of Krasno), who had prior knowledge of the planned meeting in New York City (in the case of Amos), or who had longstanding personal and professional ties with Dr. Frost (in the case of all three).[1]

62.     Of the IVAX directors in Dr. Frost's "inner circle" Dr. Betty Amos was among the closest to Dr. Frost.  In credible testimony she gave at trial, it was established that she had prior knowledge of the IVAX / Teva meeting that took place in New York and counted among Dr. Frost's oldest friends and professional colleagues.  *See* TT at pp. 242, 257-259.  It is undisputed that soon after the IVAX / Teva meeting in New York concluded, Dr. Frost called Dr. Amos from the private plane he boarded to update her on the results of the meeting. Despite the closeness of their relationship and the fact that unlike Dr. Zachariah, Dr. Amos was

---

[1]     Krasno had known Dr. Frost for at least ten years before being invited to join the board of IVAX, was a personal friend of Dr. Frost, and had served on a prior corporate board with him from the mid-1990's until 2004.  *See* Plaintiff's Trial Ex. 367 (Krasno Summary).  Pitt had known Dr. Frost for 20 years, having first met him in the mid-1970's when Pitt was a scientific consultant to Key Pharmaceuticals where Frost was a director, and having worked as a consultant to IVAX prior to joining the board.  *See* Plaintiff's Trial Ex. 368 (Pitt Summary).

part of Dr. Frost's "inner circle," the information Dr. Frost gave Dr. Amos relating to the IVAX / Teva deal was scant.  Credible testimony from Dr. Amos reveals that while she was informed that the meeting was a "success" and that future prospects of a business relationship between IVAX and Teva looked "promising" she herself wasn't entirely certain whether the proposed deal involved a merger or an acquisition, was never informed that Teva had offered a price of $26 per IVAX share, or even that a share price was discussed, and had understood that the meeting did not conclude with a finalized deal, but only an agreement to discuss a deal at a future meeting. *See* TT at pp. 246-248, 252, 254, 269-270.

63.     To buy the SEC's argument, the Court would have to believe that Dr. Frost not only reached Dr. Zachariah on the day in question to update him on the IVAX / Teva meeting, but that when he did reach Dr. Zachariah, he gave him more details regarding the deal than he gave to Dr. Amos, his long-time friend and colleague who, unlike Dr. Zachariah, was part of Dr. Frost's "inner circle."  For obvious reasons the Court finds the SEC's argument in this regard strains credulity.

64.     Credible testimony from IVAX directors Amos, Krasno and Pitt also establishes that they did not speak to anyone else about the information they learned from Dr. Frost on July 6 and were not aware of Dr. Frost speaking to any other board members on July 6.  *See* Trial Transcript (Betty Amos) at pp. 246-253; Plaintiff's Ex. 367 at p. 2; Plaintiff's Ex. 368 at p. 2.

65.     Significantly, there are a number of other directors of IVAX – including Mark Andrews, Ernst Biekert, Jack Fishman, and Avram Hershko – for whom no evidence was introduced at trial to show whether or not they were ever advised of the potential transaction

19

with TEVA at any point in time before the July 11, 2005 special meeting at which the full board was advised.

66.    Dr. Zachariah himself testified that he did not learn of the potential acquisition of IVAX by Teva until the special board meeting called on July 11, 2005, where all of the directors were apprised of the status of the discussions.  *See* Plaintiff's Trial Ex. 34; TT at p. 1473. Again the Court finds Dr. Zachariah's testimony in this regard credible and consistent with the credible testimony of other key witnesses and with the evidence of record.

67.    On Monday, July 25, 2005, IVAX publicly announced it was being acquired by Teva in a transaction in which Teva would pay $26 per IVAX share or would convert IVAX shares into a certain number of Teva shares plus cash.  The share price of IVAX went from $22.88 to $25.17 on that date.  *See* Plaintiff's Trial Ex. 276.  Dr. Zachariah did not sell any of his IVAX shares following the announcement of the merger.  *See* Defendant's Trial Ex. 9.

68.    The IVAX-Teva merger closed on January 26, 2006.  As a result of the merger, Dr. Zachariah's IVAX shares were converted into Teva shares and a certain number were cashed out under the terms of the merger agreement.  *See* Defendant's Trial Ex. 9.

69.    Dr. Zachariah did not sell his Teva shares until February and May of 2006.  *See* Defendant's Trial Ex. 9.

70.    The record is devoid of any evidence of Dr. Zachariah's being instructed by IVAX general counsel Mr. Steve Rubin or by anyone else, after his IVAX purchase on July 6, 2005, to do anything other than continue to hold the shares and handle them as he chose.  *See* TT at pp. 1469-1472.

### *IVAX's Insider Trading Policies and Procedures*

71.     In-house counsel for IVAX, Mr. Steven Rubin, testified at the trial that IVAX only had an "informal practice" for advising new directors of its Insider Trading Compliance Procedures.  *See* TT at p. 539.

72.     On May 6, 2005, Just over a week after becoming a director of IVAX, Dr. Zachariah's office was sent a memorandum from an IVAX paralegal attaching a package of documents comprised of: (1) two copies of a Director Indemnification Agreement; (2) two copies of a Power of Attorney; (3) the IVAX Corporation Policies and Procedures Manual; and (4) New IVAX Insider Trading Compliance Procedures.  This package was sent two days after he had already bought shares on May 4, 2005.  *See* Plaintiff's Trial Ex. 23.

73.     Dr. Zachariah testified in credible fashion that he did not realize he had received the package of documents sent by IVAX and neither saw nor signed any of the documents contained in said package, including the indemnification agreement and certificate indicating he had received and read the Insider Trading Policies of IVAX contained therein. *See* TT at 1463.  None of the documents were ever returned to IVAX.  *See* TT at pp. 1462-1466.  The original Director Indemnification Agreement was later found still sitting in Dr. Zachariah's office files, unsigned by him and, according to Dr. Zachariah's trial testimony which the Court finds credible, unreviewed by him as well.  *See* TT at pp. 1462-1463; Defendant's Trial Ex. 30.

74.     Dr. Zachariah's testimony that he did not send the subject policy documents back to IVAX is confirmed by testimony of IVAX in-house counsel, Mr. Steve Rubin. In testimony the Court finds credible, Mr. Steve Rubin stated at the trial that his office did not have copies of any of the subject documents in its files showing that they had been sent back

21

by Dr. Zachariah's office.  *See* TT at p. 622.   IVAX itself did not have any procedure for following up to make sure that the Insider Trading Policy was read and the Certificate returned. *See* TT  at p. 540.

75.     Dr. Zachariah credibly testified that notwithstanding the fact he never received the subject policy documents, he was nonetheless under the impression as a result of his interactions with IVAX's legal department that any trades of IVAX stock had to be reported to the General Counsel's office within 24 hours.  *See* TT at p. 1461.

76.     Other  IVAX directors stated in testimony the Court finds credible that they suffered from the same lack of a clear understanding of what IVAX policies required them to do.  Like Dr. Zachariah, director Dr. Betty Amos understood the IVAX policy just to be a "notification" policy, not a "pre-clearance" policy.  *See* TT at p. 262.  Even Dr. Phillip Frost testified that he did not recall IVAX having a mandatory pre-clearance procedure.  *See* Plaintiff's Trial Ex. 363 (Frost Summary) at p. 2.

77.     In addition, this was not the only occasion where IVAX officers or directors had inadvertently violated the company policy by failing to pre-clear a trade or trading during a "blackout period."  *See* TT at p. 629.

78.     IVAX in-house counsel Mr. Steve Rubin testified that after speaking to Drs. Zachariah and Frost regarding the subject incident, he considered Dr. Zachariah's violation of IVAX's internal procedures to have been inadvertent. *See* TT at p. 642. As before the Court finds Mr. Steve Rubin's testimony in this regard credible.

### _Dr. Mammen P. Zachariah's Purchase of IVAX Shares_

79.     Dr. M. Zachariah is Dr. Zachariah's brother.  Dr. M. Zachariah is a distinguished cardiologist at Holy Cross Hospital, and the brothers have offices on the 3rd floor at Holy Cross Hospital.   _See_ TT at pp. 414, 1503.

80.     Dr. M. Zachariah testified at the trial for what amounted to a protracted period of time, during which he was subjected to rigorous cross-examination by highly-skilled and experienced counsel. With one minor exception relating to the area of his testimony regarding whether he placed the subject trades solely or with the assistance of his wife, the Court finds Dr. M. Zachariah's testimony to be credible and consistent with the testimony of other key witnesses and with the evidence of record.  Even viewing the SEC's attempted impeachment of Dr. M. Zachariah on the point of the trade placement as being successful, the inference the SEC would have the Court draw from this fact is illogical. If Dr. M. Zachariah wanted to quickly capitalize on newly received insider information as the SEC alleges,  it is more likely that he would have taken the few minutes necessary to have handled the trades personally rather than direct his wife to make the trades. A review of the tapes between the stock broker and Dr. M. Zachariah's wife makes clear that his wife had virtually no experience in handling such transactions and indeed because of her inexperience did not complete  the sales as directed by her husband, undercutting the SEC's argument in this regard. As a collateral aspect of the impeachment which established that Dr. M. Zachariah knowingly gave false testimony in the investigatory stage regarding whether or not his wife ever placed trades in the account, it's clear that this false statement was an isolated instance designed to protect his wife and, when viewed alongside the totality of the evidence in this case and the remainder of Dr. M.

Zachariah's testimony and that of all the other witnesses, does not render the remainder of his testimony unreliable.

81.     In testimony the Court finds to be credible, Dr. M. Zachariah testified at trial that IVAX is a company that was widely known among doctors in the South Florida area and in the hospital in which he worked in particular.  He stated he was familiar with the company and had heard it discussed in a favorable light by fellow doctors and/or patients days before his purchase of the stock.   *See* TT  at pp. 417, 422-425.

82.     Dr. M. Zachariah and his wife, also a practicing cardiologist, maintain brokerage accounts with Charles Schwab.  Although Dr. M. Zachariah invests less frequently than his brother, he too has a long history of trading in individual stocks and other products.  He also has a history of making substantial and impulsive bets on individual stocks that testimony reveals he knows little about.  *See* TT at pp. 462, 468, 484.

83.     On Jul y 22, 2005, Dr. M. Zachariah made identical purchases of 2,000 shares in two different stocks in his Charles Schwab brokerage account.  He purchased 2,000 shares of IVAX for approximately $45,000.  He also purchased 2,000 shares in a second company (Global E-Point), which he sold the same day for a profit of $424.  *See* Plaintiff's Trial Ex. 318. At this time, he had over $200,000 in cash available in the account to invest, which means that he used only approximately 25 percent of the funds readily available to him in his stock account to purchase the IVAX shares in question.   *See* Plaintiff's Trial Exhs. 318, 320.

84.     When IVAX announced the transaction with Teva, Dr. M. Zachariah sold his shares for a profit of just $4,547.  *See* Plaintiff's Trial Exs. 318, 320.

85.     In testimony the Court finds credible, Dr. Zachariah testified that after he learned of the potential transaction with Teva at the special board meeting on April 11, 2005, he knew to keep the information confidential and discussed it with nobody, including his brother.  *See* TT at p. 1358.

86.      Dr. M. Zachariah's testimony was consistent with testimony of his brother and is found by the Court to be credible.  Dr. M. Zachariah testified that he did not discuss IVAX with his brother, and that he made the decision to buy shares in IVAX as well as in Global E-Point of his own accord. *See* TT at pp. 415-417.

87.     The Court specifically finds that with the exception of the limited area of Dr. M. Zachariah's testimony referred to previously regarding trade placement, each of the following key witnesses in this case who testified incident to the IVAX stock purchase, Dr. Zachariah, his brother Dr. M. Zachariah, IVAX CEO Dr. Frost, IVAX Board Member Dr. Amos, IVAX in-house counsel Mr. Steve Rubin and Schwab representative Mr. Alex Haywood, were credible in every aspect and their testimony internally consistent and consistent with the evidence of record. Each of these witnesses were subjected to examination and vigorous cross-examination for a protracted period of time by experienced and seasoned attorneys, many of whom had the advantage of prior deposition testimony from which they could hope to use for purposes of impeachment.  Despite the obvious pressure, not a single one of these witnesses (except for the isolated instance in Dr. M. Zachariah's testimony referred to previously) faltered or appeared evasive in either their manner or in the substance of their testimony. Rather, the testimony of each of these witnesses appeared to the Court to be truthful, forthright and

internally consistent, and absent of any evasion one would expect to see if prevarication were present.

### C.   THE CSC PURCHASES

88.   CSC was a Florida corporation, headquartered in Sarasota, Florida, that operated juvenile and adult correctional facilities.  Its stock was traded on the NASDAQ stock exchange.

89.   Dr. Zachariah had a substantial history of trading in the stock of companies in the correctional services industry before he bought and sold shares of CSC in 2005.  His first trades in The GEO Group, Inc. ("GEO"), a Florida company involved in corrections management, took place over a decade ago.  Between June 2004 and April 2005, before the trades at issue in this case, he purchased over $1.5 million worth of GEO stock at various points in time. *See* Defendant's Trial Exs. 5 & 9.  Similarly, Dr. Zachariah traded in the shares of Correctional Corporation of America ("CCA"), another corrections business.  Prior to the investment at issue here, Dr. Zachariah bought $351,160 in CCA shares in August 2004 and another $113,743 in March 2005. *Id.*

90.   Dr. Zachariah's extensive trading in corrections company stocks in 2004-2005 was as follows:

| STOCK | ACTIVITY | DATE |
|---|---|---|
| GEO | Sold 27,500 Shares | April 2004 |
| CCA | Sold 10,000 Shares | April 2004 |
| GEO | Sold 7,700 Shares | May 2004 |
| GEO | Bought 14,700 Shares | May 2004 |
| CCA | Bought 10,000 Shares | August 2004 |
| GEO | Sold 9,000 Shares | September 2004 |
| GEO | Sold 21,000 Shares | October 2004 |
| GEO | Sold 1,000 Shares | November 2004 |
| CCA | Sold 10,000 Shares | November 2004 |
| GEO | Bought 17,500 Shares | February 2005 |
| GEO | Sold 2,000 Shares | February 2005 |
| CCA | Bought 3,000 Shares | February 2005 |

| CSC | Bought 6,000 Shares | March 2005 |
|-----|---------------------|------------|
| GEO | Sold 15,500 Shares | March 2005 |
| GEO | Bought 20,000 Shares | March 2005 |
| GEO | Bought 5,500 Shares | April 2005 |
| GEO | Sold 24,900 Shares | April 2005 |
| CSC | Sold 3,000 Shares | May 2005 |
| CSC | Bought 31,000 Shares | May 2005 |
| GEO | Sold 100 Shares | May 2005 |
| CSC | Bought 41,000 Shares | June 2005 |
| GEO | Bought 5,000 Shares | June 2005 |
| CSC | Bought 5,150 Shares | July 2005 |
| CSC | Sold 80,150 Shares | July 2005 |
| GEO | Sold 5,000 Shares | July 2005 |
| GEO | Bought 19,000 Shares | July 2005 |
| GEO | Sold 14,000 Shares | August 2005 |
| GEO | Sold 8,000 Shares | September 2005 |
| GEO | Bought 3,000 Shares | September 2005 |
| GEO | Bought 9,000 Shares | October 2005 |

*See* Defendant's Ex. 5 & 9.

### *Dr. Zachariah's Purchases and Sales of CSC*

91.     Dr. Zachariah, already an investor in correctional company stocks, got the idea to purchase shares in CSC after speaking to his friend, Dr. Robert C. Ashburn. This fact was established at trial by the credible testimony of both Dr. Ashburn and Dr. Zachariah.   Dr. Ashburn is a former Florida state official who now works as a consultant and entrepreneur in Tallahassee, Florida.  *See* TT at pp. 1101, 1223.

92.     Dr. Ashburn and Dr. Zachariah first met when Dr. Ashburn was a state official with responsibility over the Florida Board of Medicine, and Dr. Zachariah was on that Board and later its Chairman.  They remained friends after that time and have remained in touch with each other on a variety of social and professional matters. *Id.* at pp. 1036-1044.

93.     At trial, Dr. Ashburn testified that he told Dr. Zachariah about his own experiences with CSC during conversations sometime in 2004 or early 2005.  In the summer of 2003, Dr. Ashburn helped CSC recover $200,000 in delinquent payments from Medicaid. He subsequently offered to consult for CSC to help them collect on delinquent payments and

27

assist with other state governmental issues.  CSC never retained him, however, and Dr. Ashburn eventually came to believe the company was being managed inefficiently but would do well if new management took over.  He also understood that CSC was receiving contracts from his contacts in state government, leading him to believe it had good long term potential. Dr. Ashburn told all of this to Dr. Zachariah in one of their many conversations.  *Id*. at pp. 1052-1068, 1101, 1223.  After giving careful consideration to the witnesses demeanor and the substance of his testimony at trial, the Court finds Dr. Ashburn to be a credible witness whose testimony at all times appeared to be truthful and consistent.

94.    Dr. Zachariah initially purchased 6,000 shares of CSC in March 2005 at $2.62-$2.74 per share, for a total investment of $15,846.  This was a very small investment by Dr. Zachariah's stock trading standards.  Dr. Zachariah testified in credible fashion that his initial purchase of CSC stock came about as a result of his initial conversation with Dr. Ashburn about CSC, and that his subsequent decision to sell half of the stock in late April when it was at $2.40 per share was motivated by his belief that the stock was "going south." *Id*. at pp. 1297-1298.

95.    The SEC does not allege that there was anything improper about Dr. Zachariah's purchases and sale of CSC stock up to this point.

96.    Shortly thereafter, around Dr. Zachariah's birthday on May 2, 2005, Drs. Zachariah and Ashburn testify to Dr. Zachariah receiving a phone call from Dr. Ashburn to wish him a happy birthday.  (According to the credible testimony of Dr. Ashburn, his wife's birthday is on May 4, which triggers him to remember Dr. Zachariah's birthday at about the same date). The credible testimony of Drs. Zachariah and Ashburn establish that during this phone call Dr. Zachariah mentioned to Dr. Ashburn that he had sold shares of CSC that he had purchased,

whereupon Dr. Ashburn responded by stating that he thought that, over the long haul, the company was still going to be a good company. *Id.* at pp. 1102-1103.

97.     Although Dr. Ashburn could not recall what phone he would have used to call Dr. Zachariah, telephone records for Drs. Ashburn and Zachariah's cell phone show calls between the two on May 4, May 9 and May 12, 2005.  *See* Plaintiff's Trial Ex. 147; Defendant's Trial Ex. 16.

98.     Once again, Dr. Ashburn, a non-party to this litigation, was a credible witness in every respect.

99.     Dr. Zachariah ended up purchasing 77,150 shares over the next three months as the stock's price inched upwards from roughly $2.60 per share on May 12, 2005 to $2.90 per share by July 7, 2005.  *See* Defendant's Trial Ex. 9. This brought his holdings to 80,150 shares, worth a total of $227,038. *Id.*

100.     Dr. Zachariah testified in credible fashion that in purchasing the CSC stock during this period he relied upon the above recommendation of Dr. Ashburn and upon his own research conducted on the internet (particularly the Yahoo Finance website) and on CSC's annual report.  *See* Defendant's Trial Exs. 31A, 31B; TT at pp. 1409-1410, 1478.  Dr. Zachariah's testimony was consistent with a folder he produced at trial which contained original documents relating to CSC that included a print-out of a May 18, 2005 (12:00 a.m.) article about a Texas facility that would be managed by CSC.  He also had the original 2004 CSC Annual Report, which he had highlighted in places. *See* Defendant's Trial Exs. 31A, 31B.

101.     Notably, Dr. Zachariah's largest single purchase of CSC stock occurred on May 19, 2005, when he purchased an additional 20,200 shares for the total amount of

approximately $56,000.  This purchase coincided with the date of the printed article that Dr. Zachariah had in his files.  It also coincided with a spike in the volume of trading in CSC, indicating purchases by other investors around the country on that date as well.  *See* Defendant's Trial Exs. 9, 31A.

102.  The total amount invested in CSC was an average size for Dr. Zachariah's investments in individual stocks in his Charles Schwab accounts.  It was just a small fraction (only 4.5%) of the total amount of over $3.8 million that Dr. Zachariah had invested in his Charles Schwab brokerage account at the time.  It was also one of the smaller holdings in individual stocks that he held at the time, having invested more in 3M Corp. ($723,000), DuPont ($344,080) and Tyco ($292,000).  *See* Defendant's Trial Ex. 9.

103.  On July 14, 2005, GEO announced that it had signed a definitive merger agreement to acquire CSC in a transaction in which GEO would pay $6 per share of CSC stock.  Following the announcement, Dr. Zachariah sold his shares of CSC for a profit.  *See* Defendant's Trial Ex. 9.

104.  At trial, the SEC presented the Court with a multiple choice theory in which it sought to prove that Dr. Zachariah could have learned of GEO's planned acquisition from one of the following sources: (a) his relationship with GEO's Chairman and CEO, George Zoley; (b) his son, Zachariah "Reggie" P. Zachariah, Jr., who worked at GEO; or (c) his work as a consultant for GEO. The SEC does not specify which of these three sources it believes Dr. Zachariah allegedly learned the information from.  Nor has the SEC brought claims against either George Zoley or Reggie Zachariah as putative "tippers" of Dr. Zachariah.

### *Dr. Zachariah's Relationship with George Zoley*

105.   The undisputed evidence and testimony of record establishes that in 2005, Dr. Zachariah was a friend of Mr. George Zoley, the Chairman and CEO of GEO, as well as his doctor.  Mr. Zoley was one of Dr. Zachariah's neighbors and the two periodically talked on the phone and went to benefits or fundraisers together.  Mr. Zoley has since moved to a different neighborhood and the two have drifted apart.  The two have not seen each other in roughly four years (other than at a deposition in this matter).  *See* TT at pp. 1496-1497, 1609-1611.

106.   The Court finds Mr. Zoley, the Chairman of a public company and a non-party to this litigation, to be a credible witness in all respects.  In substance and manner his testimony appeared truthful, forthright and internally consistent and was not in any way characterized by evasion or seeming prevarication.  Mr. Zoley testified credibly at trial that he never discussed the CSC acquisition with Dr. Zachariah before it was announced publicly. *See* TT at p. 1692.

107.   Mr. Wayne Calabrese, the President of GEO, was likewise a credible witness. He testified that he had worked with Mr. Zoley for over 21 years and knew him to be a person who would protect the company's confidential information carefully and had no reason to believe he would disclose it to a friend.  *See* TT at pp. 1015-1017.

108.   In its Opening Statement, the SEC claimed that Mr. Zoley and Dr. Zachariah spoke on the evening of May 18, 2005, and then Dr. Zachariah bought CSC shares the next day.  Mr. Zoley testified that he did not tell Dr. Zachariah anything about CSC in that call (or at any other point in time).  *See* TT at p. 1676.  Mr. Zoley further testified that, although he had given a sworn statement to the SEC and a deposition, he had never even been told by the

31

SEC that it was claiming that he (Zoley) had told Dr. Zachariah about the transaction with CSC. *See* TT at p. 1676.

109.    The SEC also made the claim that Mr. Zoley and Dr. Zachariah traveled to Washington, D.C. together from June 13-15, and that when Dr. Zachariah returned on June 15 he purchased 8,790 shares of CSC, suggesting that Dr. Zachariah learned something from Mr. Zoley on that trip.  However, the trading records undisputedly belie this claim.

110.    The trading records show that the order to buy CSC stock was placed by Dr. Zachariah as a limit order on June 10 - <u>before</u> he ever went on the trip to Washington.  *See* Plaintiff's Trial Ex. 282.  The limit order only happened to be filled by Charles Schwab's trading systems (and out of Dr. Zachariah's control) on June 13, 14 and 15.  *See* Plaintiff's Trial Ex. 282; TT at pp. 1196-1198.

### ***Reggie Zachariah's Work for GEO***

111.    Dr. Zachariah's son Reggie is a graduate of the Wharton School of Economics at the University of Pennsylvania.  Reggie initially interned at GEO, and after graduating from college and before going to law school, Reggie worked at GEO.  Among other responsibilities, Reggie performed financial analyses related to the CSC acquisition and was involved in the significant aspects of GEO's planned acquisition of CSC. *See* TT at p. 794.

112.    The Court finds Reggie, who at the time of trial was a law clerk for a federal judge and a member of the Florida Bar, to be a credible witness in all respects. His testimony was internally consistent and he never once faltered or appeared evasive in either the manner or substance of his testimony.  Reggie testified that he knew to keep the information about what he was working on while employed by GEO secret, and that in any event information of

this nature is simply not the kind of thing that he would talk to his father (or anyone else) about.  *See* TT at pp. 894-895. As Reggie put it, he is a person who has always "compartmentalized" between work and school and his family life, and in issues involving the GEO/CSC deal, this compartmentalization occurred.  *See* TT at pp. 894-895.

113.    One of Reggie's former employers who testified at trial described him as an "exceptional employee" and a "remarkable young man with real talent" (TT at p. 1015), and the CEO of GEO described him as a valued and trusted employee.  *See* TT at p. 1688.

114.    Dr. Zachariah has likewise testified that he had no discussions with his son about GEO's acquisition of CSC before it was announced publicly.  *See* TT at pp. 1393-1394. Dr. Zachariah's testimony on this point was likewise credible.

115.    There is no "pattern" in the calls between Dr. Zachariah and Reggie and Dr. Zachariah's purchases of CSC.  Prior to and during the subject time period Dr. Zachariah and his son Reggie spoke to each other virtually every day.  *See* Defendant's Trial Exs. 16 & 19. Accordingly, virtually anything Dr. Zachariah did could be "linked" in proximity to a call with his son.

116.    There is no evidence of Dr. Zachariah having learned of GEO's acquisition of CSC from his son Reggie, nor has the SEC even provided sufficient evidence from which such fact could reasonably be inferred.  The SEC has emphasized the July 4th weekend trip that Reggie took to the Bahamas with his father.  But Dr. Zachariah was purchasing CSC stock four months before that trip.  Several days after he got back from the trip, Dr. Zachariah purchased only $14,909 of CSC, one of his smallest purchases.  *See* Defendant's Trial Ex. 9.

### *Dr. Zachariah's Consulting Agreements with GEO*

117.    Dr. Zachariah had two basic consulting arrangements with GEO for several years.  The first arrangement was with Atlantic Shores Hospital, a mental health facility owned by a GEO subsidiary called GEO Care.  *See, e.g.,* Plaintiff's Trial Ex. 111.  Dr. Zachariah was on the board of Atlantic Shores Hospital and performed consulting work for the Hospital for which he was paid $3,500 per month for his services.  According to the credible trial testimony of Messrs. George Zoley and Wayne Calabrese, this work did not provide Dr. Zachariah with access to confidential information about GEO's corrections business and the work had nothing to do with GEO's ultimate transaction with CSC.  *See* TT at pp. 1014, 1692. *See also* Plaintiff's Trial Ex. 358 (Watson Summary) at p. 8.

118.    The second consulting arrangement was to assist GEO with access to state governmental officials in connection with its correctional facility business.  As a result of his contacts with state officials throughout the country, Dr. Zachariah was able to arrange meetings for GEO with various state officials, for which he was paid a retainer of $1,500 per month.  *See* Plaintiff's Trial Exs. 112 & 113.  GEO employed a number of other consultants to do similar work for the company.  As Mr. George Zoley, the CEO of GEO described the work, Dr. Zachariah was hired to give advice on how to promote their prison business on a national level; he knew government representatives in states, and politicians, and sometimes he would give them advice on who to talk to.  This work had nothing to do with GEO's planned acquisition of CSC.  *See* TT at pp. 1692. *See also*  TT at p. 1014; Plaintiff's Trial Ex. 358 (Watson Summary) at p. 8.

119.    Dr. Zachariah also had individual contracts for certain specific potential projects that GEO was seeking to obtain (e.g., in the state of Colorado), which did not come to fruition other than a contract for a facility in South Florida.  *See* TT at pp. 697-701, 1641-1642, 1681-1684.   Again, credible trial testimony confirms these specific contracts had nothing to do with GEO's planned acquisition of CSC and would not have provided Dr. Zachariah with any information about CSC's eventual acquisition by GEO.  *See* TT at pp. 1014, 1692;  Plaintiff's Ex. 358 at p. 8.

120.    Each of the GEO executives who were directly involved in GEO's acquisition of CSC testified in credible fashion that Dr. Zachariah had no involvement in the company's acquisition of CSC.  GEO's Chairman & CEO Mr. George Zoley testified that at no point in time did GEO ask Dr. Zachariah for advice or to assist them even remotely in any way in the acquisition of CSC.  *See* TT at p. 1692.  GEO's President & CEO Mr. Wayne Calabrese testified that he had no knowledge of Dr. Zachariah ever being asked to consult on the acquisition of CSC.  *See* TT at p. 1014.  And GEO's Vice President for Finance, Mr. David Watson, testified that Dr. Zachariah had no involvement in GEO's acquisition of CSC, that he never discussed the potential acquisition of CSC with Dr. Zachariah, and that he had no reason to believe any other GEO employee (including Reggie Zachariah and George Zoley) ever spoke to Dr. Zachariah about it.  *See* Plaintiff's Trial Ex. 358 (Watson Summary) at p. 8.

121.    The SEC's claim that Dr. Zachariah assisted GEO with "M&A consulting" is based on his brief involvement with a company called Akal.  However, the testimony at trial showed that Dr. Zachariah was asked to try to arrange a meeting with Akal because the founder of Akal was Sikh (an Indian ethnic and religious group) and Dr. Zachariah is an Indian

American.  His "M&A consulting" amounted to little more than a dinner of Indian food with the founder's son in New Mexico and some shopping, all of which led to nothing for GEO.  *See* TT at pp. 1492-1493; (George Zoley) at pp. 1682-1684.

122.    Finally, the SEC's claim that Dr. Zachariah could have figured out that GEO was going to buy CSC as a result of their use of his private plane is pure speculation.  The claim boils down to a single flight log showing a flight to Tampa, not even Sarasota, where CSC is located.  *See* Plaintiff's Trial Ex. 155.  Not even the GEO executive who was on the flight could testify what the trip was for.  *See* TT at pp. 954-955.  Given the large number and wide variety of locations that the plane traveled to and from in that same time frame, there is no reason a single flight to Tampa would alert anyone to anything.  *See* Plaintiff's Trial Exs. 155, 156, 115, 116.

### *Dr. Mammen P. Zachariah's and Dr. Sheldon Nassberg's Trades*

123.    Dr. Zachariah's brother, Dr. M. Zachariah, purchased 51,791 shares of CSC stock between July 7 and July 11, 2005.  Dr. Sheldon Nassberg, an endocrinologist who shares patients with Dr. Zachariah and is a close friend of Dr. Zachariah, also purchased 10,000 shares of CSC stock on July 7-8, 2005.  *See* Plaintiff's Trial Exs. 320 & 86.

124.    Dr. M. Zachariah and Dr. Nassberg both acknowledge that they got the idea to invest in CSC from Dr. Zachariah.  *See* TT at pp. 97, 366-367, 404.

125.    At trial Dr. M. Zachariah credibly testified that he has gotten the idea to invest in specific stocks from a variety of sources over the years, but one of the people he talks to about stock investments is his brother Dr. Zachariah.  *See* TT at pp. 365-370, 407-408.  In addition, Dr. M. Zachariah has made highly speculative bets on individual stocks with little or

no information about the company many times before. *See* TT at pp. 462, 468 and 484.  His trading records in 2004, and early and late 2005 are filled with examples of individual stocks that he had bought and sold with little or no information about what the company was or did. *See* Plaintiff's Trial Exs 318, 320.

126.    Credible testimony and evidence presented at trial also established that throughout the time period in question, Dr. Zachariah spoke with his friend and colleague Dr. Nassberg frequently, about everything from their shared patients, to politics, to hospital gossip. Dr. Nassberg typically gives Dr. Zachariah a call in the early mornings before they both start work, often almost every morning of the work week.  Dr. Nassberg has also asked Dr. Zachariah in the past to let him know what sort of stocks Dr. Zachariah was investing in.  Dr. Nassberg is not as frequent or as active a stock trader as Dr. Zachariah, but he has nonetheless taken advice from Dr. Zachariah on a number of occasions to buy stocks that Dr. Zachariah had recommended or also had purchased.  According to the credible testimony of Dr. Nassberg, CSC was just another one of these recommendations.  *See* TT at pp. 69-70, 108, 127-128, 176-178.

127.    Finally Dr. Zachariah testified in credible fashion that he was aware of no non-public information about CSC and consequently told none to either his brother Dr. M. Zachariah, his friend Dr. Nassberg, or to anyone else for that matter.  *See* TT at p. 1358. Similarly, while both Dr. M. Zachariah and Dr. Nassberg have testified that they got the idea to invest in CSC from Dr. Zachariah, both have also offered credible testimony that they learned nothing more from Dr. Zachariah than that Dr. Zachariah thought CSC was a good

stock and was investing in it himself.  Based on the foregoing the Court finds no material, non-public information was exchanged.  *See* TT at pp. 196, 491.

128.    As with the testimony regarding the IVAX transactions, The Court specifically finds each of the following key witnesses in this case who testified incident to the CSC stock purchases, Dr. Zachariah, his brother Dr. M. Zachariah, his son Reggie, his friends and colleagues, Dr. Nassberg and Dr. Ashburn, GEO Chairman/CEO Mr. Zoley, GEO President/CEO Mr. Calabrese, and GEO Vice President of Finance Mr. Watson, to be credible in all respects and their testimony to be both internally consistent and consistent with the evidence of record.  Each of these witnesses were subjected to examination and vigorous cross-examination for a protracted period of time by experienced and seasoned attorneys, many of whom had the advantage of prior deposition testimony from which they could hope to use for purposes of impeachment.  Despite the obvious pressure, not a single one of these witnesses (except for the isolated instance in Dr. M. Zachariah's testimony referred to previously) faltered or appeared evasive in either their manner or in the substance of their testimony. Rather, the testimony of each of these witnesses appeared to the Court to be truthful, forthright and internally consistent, and absent of any evasion one would expect to see if prevarication were present.

### III.    CONCLUSIONS OF LAW

#### A.    LEGAL STANDARDS

129.    Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §76j(b), 17 C.F.R. 240.10b-5, prohibits manipulative or deceptive practices in connection with the sale of securities.  *SEC v. Yun*, 327 F.3d. 1263, 1278 (11th Cir. 2003). The Act was designed to

protect investors against manipulation of stock prices by requiring full disclosure in connection with the purchase or sale of securities. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477-78 (1977)(citations omitted). The Act "does not bar all conceivable forms of fraud involving confidential information, [but] catches fraudulent means of capitalizing on such information through securities transactions. *Yun*, 327 F.3d at 1278.

130.    For ease of reference courts have divided insider trading into two different theories of liability: the "classical theory" and the "misappropriation theory." *Yun*, 327 F.3d at 1269.  Under the "classical theory," liability for insider trading results from a breach of the duty of "trust and confidence" to shareholders when a corporate insider trades because of confidential information resulting from holding a corporate position . . . ." *Id.* (citing *United States v. O'Hagan*, 521 U.S. 642, 652 (1997)).  The classical theory "applies not only to officers, directors, and other permanent insiders of a corporation, but also to attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation." *O'Hagan,* 521 U.S. at 651-2 (*citing Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983)).

131.    The "misappropriation theory" imposes liability on an outsider whose trade results from "confidential information obtained by reason of [the relationship] with the person possessing such information, usually an insider," because the outsider owes "a duty of loyalty and confidentiality" to the insider who shared the information . . . ."  In this context, "confidential information" means "material nonpublic information."   *Yun*, 327 F.3d at 1269 n.11.   One engages in "misappropriation" under this theory when he engages in "conduct constituting secreting, stealing, [or] purloining . . . [of] material, non-public information in breach of an

employer-imposed fiduciary duty of confidentiality." *United States v. Carpenter*, 791 F.2d 1024, 1031 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987).

132.    Under either the classical or misappropriation theories of insider trading, the SEC must prove that the confidential information was "material," and that the defendant acted with *scienter*. *Aaron v. SEC*, 446 U.S. 680, 695-696 (1980). For purposes of the securities laws, information is deemed "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of [available] information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway*, *Inc.*, 426 U.S. 438, 449 (1976)).  In the Eleventh Circuit, the standard for assessing materiality enunciated in *TSC Industries* has been applied to require a finding that "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *SEC v. Carriba Air Inc.,* 681 F.2d 1318, 1323 (11th Cir. 1982).

133.    *Scienter* is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Eleventh Circuit, *scienter* may be established by a showing of knowing misconduct or severe recklessness.  *Carriba Air, Inc.*, 681 F.2d at 1324.  Proof of recklessness requires a showing that the defendant's conduct was an extreme departure from the standards of ordinary care.  *Id*.

134.    In an insider trading case, the burden of proof rests on the SEC to prove by a preponderance of the evidence that the Defendant engaged in unlawful insider trading

in violation of the federal securities laws.  *SEC v. Ginsburg*, 362 F.3d 1291, 1298 (11th Cir. 2004); SEC v. Gonzalez de Castilla, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002).

135.    In insider trading cases premised upon circumstantial evidence, credibility determinations by the trier of fact take on primary importance.  These cases typically involve testimony by the defendant and/or others seeking to provide innocent explanations for the nature and timing of the trades at issue.  *See SEC v. Adler*, 137 F.3d 1325, 1342 (11th Cir. 1998).  Such "fact intensive issues should be decided by a jury [or fact-finder judge at a bench trial], which is in the position to observe the demeanor of witnesses and make appropriate credibility determinations." *Id.*

136.    On appeal, such credibility determinations are given particular deference upon review. *See, e.g., Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575-576 (1985)("When findings are based on determinations regarding credibility of witnesses, Federal Rule of Civil Procedure setting forth "clearly erroneous" standard of review for findings of fact demands even greater deference to trial court's finding; for only trial judge can be aware of variations in demeanor and tone of voice that bears so heavily on listener's understanding of and belief in what is said"); *Stano v. Butterworth*, 51 F.3d 942, 944 (11th Cir. 1995)(holding that the reviewing court defers even beyond clear error review to trial court findings relating to witness credibility determinations); *Lincoln v, Bd. Of Regents of Univ. Of Ga.*, 697 F.2d 928, 939 (11th Cir. 1983)("This deferential standard of review imposes an especially heavy burden on the appellant in a case such as this, in which the evidence was largely testimonial, and the district court had the advantage of observing the witnesses and evaluating their credibility firsthand.").

**B.**   **THE SEC'S IVAX CLAIMS**

*The SEC has Failed to Satisfy its Burden of Showing that Zachariah
Obtained Material, Non-Public Information Prior to Making his
Purchases of IVAX Stock on May 4, 2005*

137.    The SEC seeks to constructively amend its Complaint to add the allegation

that at his first meeting of the board of directors of IVAX on April 29, 2005, Dr. Zachariah

acquired material, non-public information regarding IVAX, and that on May 4, 2005, in

violation of his fiduciary duties and IVAX's internal policies and procedures, Dr. Zachariah

purchased 30,000 shares of IVAX stock.

138.    There is considerable dispute as to whether this purchase can properly be

considered at this juncture, as the claim was not included in the SEC's Complaint [2], the

deadline for amending the pleadings was on May 25, 2009, well over a year ago, and the

SEC never moved to amend [3], and there is the issue of whether the claim would be barred

by the 5-year statute of limitations under the Exchange Act, which Dr. Zachariah contends

---

[2]    The only claim contained in the Complaint relating to IVAX was the SEC's allegation that Dr.
Zachariah obtained confidential information from Dr. Frost in a July 6, 2005 telephone call.  The
Complaint is clear in this regard.  *See* Complaint (DE 1, at ¶2) (alleging that Zachariah engaged
in insider trading "when, on July 6, 2005, just minutes after learning material, non-public
information from IVAX's chairman and chief executive officer about the strong likelihood of
acquisition of IVAX by another pharmaceutical company . . . ."); *see also id.* at ¶¶20-23
(alleging only that Zachariah's purchase on July 6, 2005 constituted insider trading).

[3]    Rather than seeking to amend its Complaint in a timely fashion the SEC has sought
constructively to amend its Complaint by stating its intention to claim at trial that the purchase
on May 4, 2005 violated Section 10(b) and Rule 10b-5 in its "Statement of the Case" section in
the Joint Pretrial Stipulation (DE 104), filed on July 29, 2010. In this regard, the Court notes that
the SEC would have a difficult time proving the purchase of shares by Dr. Zachariah on May 4,
2005 was "newly-discovered evidence" in that the purchase was a matter of public record, with
IVAX and Dr. Zachariah having filed a Form 4 with the SEC on May 4, 2005 disclosing the
purchase. Moreover, as Dr. Zachariah correctly observes, the SEC conducted an extensive
investigation before it filed the Complaint in this matter and presumably was well aware of the
purchase from, among other sources, Dr. Zachariah's own brokerage account records and
investigative testimony to the SEC, yet despite this knowledge chose not to add the claim to its
Complaint.

expired for this claim on May 4, 2010.  An additional concern arises as to possible prejudice Dr. Zachariah might suffer if the addition of this claim were to be permitted on what amounts to the eve of trial, in that Dr. Zachariah did not have an opportunity to conduct discovery on this claim, which, at the very least would have included deposing the other participants in the April 29, 2005 board meeting.

139.   For its part, the SEC argues it should be permitted to constructively amend its Complaint to add the April 29, 2005 trade that was unidentified therein.  As grounds in support of its Motion, the SEC argues: (1) that references to the May 4, 2005 trades in the SEC's expert report suffice for purposes of Zachariah being placed on notice that the claim was being added to the Complaint by the SEC; and/or  (2) that references to the May 4, 2005 trades in the SEC's brief in opposition to Dr. Zachariah's motion for partial summary judgment, which did not even address the IVAX claims, suffice for purposes of notice. Whether such notice would suffice under the circumstances is questionable at best.  *See, e.g., Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1568 (11th Cir. 1987) ("[Plaintiff] never moved to amend her complaint, and the inclusion of the claims in the pretrial stipulation, the mention of them in discovery and the filing of motions concerning those claims were not a substitution for the factual allegations of a complaint under Federal Rule of Civil Procedure 8(a)" ); *Anderson v. United Parcel Serv., Inc.,* 506 F. Supp. 2d 1215, 1227 (S.D. Fl. 2007) (Marra, J.)("Clearly, the deadline for amendment of the complaint has long expired.  The Amended Complaint simply did not plead this claim [for retaliatory discharge], and amendment of a complaint may not occur through argument in a brief opposing summary judgment.")(citations omitted).

43

140.    Because the Court finds that even if the SEC were permitted to constructively amend its Complaint in the way desired it would be unable to satisfy its burden of showing that Dr. Zachariah possessed non-public information at the time of the May 4, 2005 IVAX purchase, there is no need to determine whether such constructive amendment should be permitted.

141.    As a preliminary matter, the Court finds that Dr. Zachariah provided an entirely credible and logical explanation for his May 4, 2005 purchase of IVAX shares.  Dr. Zachariah testified that he made the purchases on May 4, 2005, shortly after attending his first board meeting, because he had seen the substantial number of shares held by his fellow directors and had resolved to increase the size of his holdings to be more in line with those of his fellow directors and to show his commitment to the company. The Court finds Dr. Zachariah's testimony in this regard to have been not only credible, but also consistent with similar decisions made by other directors of IVAX.  For example, Richard Krasno, who also became a director in early 2005, Bertram Pitt, and Betty Amos all testified that they had each bought IVAX stock after they became members of the board to show their support for the company.  Mr. Steve Rubin, the General Counsel for IVAX, likewise testified that it was not unusual for new members of the board to purchase stock.

142.    Additionally, the SEC introduced no evidence that there was any material, non-public information disclosed at the April 29 board meeting.  It is undisputed that there was no discussion of the potential transaction with Teva at the April 29 board meeting, and that there was no special blackout period imposed after the meeting (as there would be if there had been disclosure of material, non-public information about a potential transaction).  Dr. Betty Amos testified that there was nothing of particular note discussed at the meeting

regarding potential deals, and IVAX General Counsel, Mr. Rubin testified that there was nothing that could be considered material, non-public information disclosed at the meeting about any deals.

143.    The Court also notes that while the SEC attempted to prove at trial that Dr. Zachariah had been provided a copy of IVAX's Insider Trading Compliance Procedures at this point in time, the evidence is otherwise and reveals that although the packet was mailed to Dr. Zachariah's office, Dr. Zachariah personally neither received nor reviewed it. [4]

### *The SEC Has Failed to Satisfy Its Burden of Showing That Zachariah Obtained Material, Non-Public Information Prior to Making His Purchases of IVAX Stock on July 6, 2005*

144.    The SEC contends that Dr. Zachariah made the purchase of 35,000 shares of IVAX stock on July 6, 2005 after allegedly having learned of material, non-public information in a telephone conversation with Dr. Frost at 2:02 p.m. in a call Dr. Frost made from his private plane.  For the following reasons, the SEC has failed to carry its burden of proving that Dr. Zachariah in fact obtained material, non-public information prior to making his purchases of IVAX stock on July 6, 2005.

145.    First and foremost, no witness has testified that Dr. Zachariah was told anything about the Teva discussions before the July 11, 2005 board meeting where it was disclosed to the full board of directors.  At trial Dr. Zachariah represented in testimony the Court finds credible that July 11 was the first time he learned of the potential transaction.

---

[4]    It bears mention that on May 5, 2005, the very next day after Dr. Zachariah purchased shares, his fellow director Dr. Krasno also purchased shares.  Dr. Krasno was at the same board meeting as Dr. Zachariah on April 29, 2005; yet the SEC has made no claim that Dr. Krasno's purchase was improper in any way and has taken no action against him.

IVAX's General Counsel, Mr. Steve Rubin, likewise testified that he confirmed with Dr. Zachariah on July 6 that he did not have any inside information when he made the purchases, and Mr. Rubin had no reason to believe otherwise.

146.    Most significantly, Mr. Rubin has testified that he spoke to Dr. Frost on July 6 or July 7 to determine whether Dr. Frost had disclosed anything to Dr. Zachariah and, in response to Mr. Rubin's query, Dr. Frost stated that he had not.  Dr. Frost had no reason to lie to his General Counsel, and his General Counsel has no reason to lie about what Dr. Frost told him.  Although the SEC sought to attack its own witness after Mr. Rubin provided this testimony in Court, Mr. Rubin was an entirely credible witness.

147.    Second, Dr. Zachariah's conduct in immediately informing the company's General Counsel of his trades, and then following his advice on how to handle the trades, is completely inconsistent with someone engaged in insider trading.

148.    Third,  Dr. Zachariah's purchase was consistent with his previous plan to show his commitment to the company as a new director.  Other new directors had done the same thing in the past.  Dr. Zachariah had already purchased 30,000 shares days after becoming a new director, and his purchase of shares on July 6 was consistent with this plan and equal in amount to his current holdings.  As the Eleventh Circuit has stated: "[P]recedent and common sense indicate that where an inference of possession of inside information arises from the suspicious timing of the sale, a credible and wholly innocent explanation for said sale and timing tends to rebut the inference."  *SEC v. Adler*, 137 F.3d 1325, 1341 (11th Cir. 1998); *see also Freeman v. Deco,* 584 F.2d 186, 197 & n.44 (7th Cir. 1978) (district court correctly determined that inference of insider trading created from an

insider's sale of stock just prior to negative corporate announcement was "nullified" in light of similar past trading patterns and reasonable explanations for the sale).

149.    Fourth, Dr. Zachariah's purchase was consistent with his prior trading in the stock market.  Before being invited to join the board of IVAX, Dr. Zachariah had bought and sold 50,000 shares of IVAX and profited in the amount of approximately $54,000.  The SEC does not contend that there was anything illegal about these trades.  The purchase of 35,000 shares for approximately $700,000 on July 6 was not only consistent with amounts he had invested previously in IVAX, but it was also consistent with amounts he had invested in other individual stocks.  The investment consumed only a portion of the available cash that he had on hand on that date to invest.  This is noteworthy in that, as the Eleventh Circuit has cogently observed under similar circumstances, the inference that the timing of a trade was based on inside information "can be nullified by a showing that [the trades] in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence."  *Adler*, 137 F.3d at 1341; *see also SEC v. Moran,* 922 F. Supp. 867, 893 (S.D.N.Y. 1996) (defendant's history of purchasing large quantities of similar stocks weighed against finding of insider trading).

150.    Fifth, the inferences that the SEC seeks to have drawn from the timing of the phone calls on July 6 are not reasonable, while the inferences that Dr. Zachariah seeks to have drawn are.  No witness has testified as to who was on the line of the call between Dr. Frost's office and Dr. Zachariah's office at 2:02 p.m. on July 6, and no witness has testified as to what, if anything, was said in that call.  Indeed, because another call was placed from the plane phone at 2:04 p.m. (indicating that Dr. Frost was no longer on the call taking

place from his office at 2:02 p.m.), it appears to be impossible that Dr. Frost's office was able to connect him to Dr. Zachariah's office in the 2:02 p.m. call.

151.    By contrast, it is reasonable to infer that Dr. Frost did not successfully reach Dr. Zachariah in his apparent effort to do so at 2:02 p.m.  As noted, Dr. Frost is making another call to his office from the plane at 2:04 p.m. at the same time his office is supposedly trying to connect him with Dr. Zachariah's office.  In addition, Dr. Zachariah's phone records show that his office called Dr. Frost's office back at 2:11 p.m. and 2:15 p.m. These calls back are inexplicable unless the 2:02 p.m. call did not go through.  In pursuing its line of reasoning the SEC appears to have forgotten the basic and well-established precept that "a finding of fact which may be inferred but not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists." *Bald Mountain Park v. Oliver*, 863 F.2d 1560, 1564 (11th Cir. 1989); *see also Bodie v. Perdue*, 236 Fed. Appx. 511, 521 (11th Cir. 2007)(refusing to credit tenuous fact inference where there existed express and uncontradicted testimony to the contrary).

152.    Moreover, in its closing arguments the SEC contended that there was a 3 minute difference between the time indicators on the IVAX phone records and phone records from phone service providers.  But without any witness testimony from one of the phone service providers or elsewhere to explain the apparent discrepancies, this merely serves to underscore the unreliability of the phone record evidence.

153.    Sixth, the SEC also alleges that Dr. Zachariah, after attending IVAX board meetings where the merger involving Teva and IVAX was discussed, subsequently tipped his brother Dr. M. Zachariah with this inside information. As a factual matter, the SEC has failed to meet its requisite burden of proof to establish such. Both Dr. Zachariah and his

brother Dr. M. Zachariah have represented in testimony the Court finds credible, that no such information (or any information at all about IVAX) was ever communicated, and Dr. M. Zachariah for his part provided the Court with a logical alternative explanation for his purchase of the stock which the Court finds credible. According to the testimony of Dr. M. Zachariah, his decision to purchase the subject IVAX stock was motivated by the "talk" and "rumors" that swirled around the hospital at the time regarding what was viewed by some as an upward prediction of the stock.  This credible testimony of Dr. M. Zachariah finds support from the record evidence that the IVAX share purchase was relatively small, made at around the same time Dr. M. Zachariah purchased an equal number of shares in an unrelated company on July 21, 2005, and constituted only a small fraction (approximately 25%) of the available cash in his brokerage accounts at the time.  A reasonable inference can be made that if indeed Dr. M. Zachariah were acting pursuant to a tip from his brother, the amount of IVAX shares purchased would have been significantly greater.

154.    Finally, in faulty "cart before the horse" reasoning the SEC asks the Court to infer from the fact that two other doctors in the hospital (Drs. Nassberg and M. Zachariah) purchased IVAX stock on the same day as Dr. Zachariah, that their purchases must have been inspired by a tip from Dr. Zachariah who disclosed inside information. As a factual matter, the SEC has failed to meet its requisite burden of proof to establish such. Without having insider information to transmit, the coincidence that two other doctors purchased medical stock on the same day is of no moment and evidence of nothing. The SEC's faulty logic simply cannot withstand scrutiny as a matter of law in that before you get to the step of acting on insider information, the SEC would first have to establish that Dr.

Zachariah was in possession of such insider information, an allegation the Court finds refuted by the direct evidence of record and the credible testimony at trial.

### *The SEC Has Failed To Satisfy Its Burden of Showing That Zachariah Acted With the Requisite Scienter*

155.     The SEC must also prove that Dr. Zachariah acted with *scienter* when he purchased the IVAX shares on July 6, 2005 – that is, that Dr. Zachariah acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12.  The SEC has utterly failed to meet its burden in this regard.

156.     Central to the SEC's theory of liability in this case is the notion, first recognized in *O'Hagan*, of  "Deception through nondisclosure... ." *Id*. 521 U.S. at 654.  As shall be seen, however, the facts that exist in this case work to undercut this notion, rather than shore it up.  The instant case is unique in that the alleged inside trader did nothing to conceal his trades.  Thus, after finalizing his share purchases Dr. Zachariah immediately and fully disclosed his trades to the company's general counsel, immediately took steps to try to remedy the situation, and acted entirely consistently with the general counsel's requests.  Under these circumstances, and based upon the scant and tenuous evidence the SEC managed to present at trial, the SEC simply has not carried its burden of proof on this essential element.

157.   First,  Dr. Zachariah's conduct in immediately informing IVAX's General Counsel of his trades, and then following his advice on how to handle the trades, is completely inconsistent with someone acting with the intent to deceive, manipulate or defraud.  Dr. Zachariah made no effort to conceal his purchases, making them in his own

account in his own name, and immediately advising the company's General Counsel about it as he thought he was supposed to do.

158.    Next, Dr. Zachariah immediately offered to remediate the purchase but was advised by the company's General Counsel, Mr. Rubin, not to.  Mr. Rubin first, and sensibly, asked Dr. Zachariah to try to have the trades unwound.  Dr. Zachariah attempted to do so, but learned that Charles Schwab could not unwind an executed trade.  Dr. Zachariah then offered to sell the shares immediately at a loss or transfer them so that he would not benefit from them.  Mr. Rubin, however, instructed him not to do so.  This is not the behavior of someone acting with the requisite *scienter*.  As another federal court recently observed after the bench trial of an insider trading case in New York, "[t]he wholesale lack of any deceptive conduct in this case by [the defendants] underscores that the SEC has failed to establish the necessary elements of its section 10(b) and Rule 10b-5 claim against the defendants."  *See SEC v. Rorech*, 2010 WL 2595111, at *50 (S.D.N.Y. June 25, 2010) (Koeltl, J.).

159.    Finally, the Court finds that Dr. Zachariah's violation of IVAX's written Insider Trading Policy was not intentional.  Dr. Zachariah was a new member of the IVAX Board, having been on the Board just over 2 months when his purchases on July 6 were made.  Dr. Zachariah was not even sent a copy of the policy until May 6, 2005 – after he had already purchased IVAX shares on May 4.  At trial Dr. Zachariah credibly testified that he neither received the Trading Policy packet nor reviewed it, and was instead under the impression that he had to report any trades to the company within 24 hours.  It was this understanding that Dr. Zachariah was operating from when he reported the trades to General Counsel. Dr. Zachariah's testimony in this regard is substantiated by the fact that

51

normally accompanying the Trading Policy packet is a certification form that the Board Member is instructed to send back indicating the director had received a copy of the policy and affirming that he or she had read it.  In this instance, the subject return form was never received by IVAX from Dr. Zachariah.  As Dr. Zachariah testified, if he had known about and read the written policy, he never would have found himself entangled in this matter.

160.    Notably, other directors also testified ambiguously about their knowledge of the policy as well.  Based on the evidence and testimony presented on this issue, the Court finds itself in agreement with the conclusion reached by IVAX General Counsel Mr. Rubin that Dr. Zachariah's violation of the company's internal policies was inadvertent.

C.    **THE SEC'S CSC CLAIMS**

161.    The SEC also alleges that Dr. Zachariah acquired material, non-public information in May 2005, when GEO was conducting due diligence into CSC.  The SEC has never specifically identified how it believes that Dr. Zachariah learned of the pending merger, but instead has adopted a multiple-choice theory asking the Court to find that Dr. Zachariah obtained the information in one or more of the following ways: (1) he was a long-time consultant to GEO regarding various matters; (2) he had a friendship with GEO's CEO, George Zoley, or (3) his son, Reggie, was employed in GEO's mergers and acquisitions group and worked directly on the CSC-GEO merger.

162.    The Court finds that the SEC has not meet its burden of proving that Dr. Zachariah obtained material, non-public information about the CSC acquisition from any of these sources.

163.    First, Dr. Zachariah has provided an innocent and persuasive explanation to explain the trading the SEC challenges by testifying that he learned of CSC and decided

52

to buy its stock after discussions with his friend Dr. Robert Ashburn.  The testimony of Dr. Ashburn on this point is credible and corroborates the testimony of Dr. Zachariah.  As the Eleventh Circuit has cogently stated: "[P]recedent and common sense indicate that where an inference of possession of inside information arises from the suspicious timing of the sale, a credible and wholly innocent explanation for said sale and timing tends to rebut the inference."  *Adler*, 137 F.3d at 1341; *see also Freeman*, 584 F.2d at 187 & n.44 (finding no inference of wrongdoing where, among other reasons, defendant had reasonable explanations for sales); *Moran,* 922 F. Supp. at 893 (citing to defendant's innocent explanations for his stock purchases in finding no insider trading occurred).

164.    Additionally, original documents in Dr. Zachariah's possession, including a print-out of an internet article referencing CSC from May 18, 2005 (12:00 a.m.) and a highlighted copy of CSC's 2004 Annual Report, show that Dr. Zachariah performed his own research into the company – conduct that is inconsistent with being in possession of inside information. In particular, the date of the news article becoming public information coincides with when Dr. Zachariah made a substantial purchase of CSC shares on May 19 (and when there was a general spike in volume from other purchases of the stock as well).

165.    Of further import is the fact that the quantity and quality of Dr. Zachariah's trading activity in CSC are consistent with his prior trading history.  This is not a case where the trades at issue are unusual or exceptionally large for the individual at issue.  In the first half of 2005, for example, Dr. Zachariah purchased shares of 3M Corp., AIG and DuPont, for $617,379, $771,776 and $327,704, respectively.    Purchases in each of these

companies were significantly larger than the $200,000 of CSC purchased by Dr. Zachariah between May 11 and July 7, 2005.

166.    Finally, Dr. Zachariah's trades in CSC were not his first foray into correctional industry securities.   (*See* ¶ 83 above.)   As the Eleventh Circuit has had occasion to observe, the inference that the timing of a trade was based on inside information "can be nullified by a showing that [the trades] in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence."  *Adler*, 137 F.3d at 1341; *see also Moran,* 922 F. Supp. at 893 (defendant's history of purchasing large quantities of similar stocks weighed against finding of insider trading).

167.    Nor has the SEC introduced any substantive evidence that any of the alleged sources of the confidential information actually provided such information to Dr. Zachariah. Indeed, the SEC's case is so weak in this regard that not only was there no direct evidence of such information having been provided, but the evidence presented was to the contrary. Namely, multiple witnesses testified that Dr. Zachariah's consulting work for GEO did not provide him with access to GEO's confidential information unless it was specifically disclosed to him, which all concerned have categorically denied, and that he had no involvement in the acquisition of CSC.

168.    The lengths to which the SEC went to attempt to attack the credibility of non-party witnesses, including its own witnesses, highlights the weakness of its claims. For example, the SEC referred to Reggie Zachariah as a "drinker" in its closing argument and slides – a bizarre allegation that was entirely unsupported by the record evidence.

169.    In addition, Mr. George Zoley and Mr. Wayne Calabrese were eminently credible witnesses with no reason to prevaricate or favor one side over the other in this matter.  Both confirmed in testimony free of even the slightest hint of evasion or discomfort, that Dr. Zachariah had <u>no</u> access to GEO's confidential information unless it was provided to him by one of them, which they adamantly deny having ever provided, and had <u>no</u> involvement in GEO's decision making process or methodology for acquiring CSC. Notably, in the case of Mr. Zoley, the SEC had never even advised him, the SEC's own witness, that one of their theories relied on an implication that Mr. Zoley had disclosed confidential information to Dr. Zachariah in a May 18 phone call or otherwise.  In other words, the SEC has presented a theory to the Court that it has not even had the courage to directly ask its own witnesses about.

170.    Dr. Zachariah's personal relationships with his son and with Mr. Zoley do not establish possession of non-public information.  Dr. Zachariah does not dispute that he regularly communicated with his son Reggie – and in fact did so far more regularly and innocuously than the isolated communications singled out by the SEC.  However, courts that have considered alleged possession of non-public information based solely on a defendant's communication with so-called insiders have held such contacts are not sufficient to sustain an insider trading claim.  *See SEC v. Goldinger*, 1997 WL 21221, *3 (9th Cir. Jan. 14, 1997) (unpublished) (holding that the SEC "cannot merely provide circumstantial evidence to show the <u>possibility</u> of illegal trading.  The SEC's evidence and reasonable inferences from that evidence must be sufficient to allow a reasonable jury could find it met its burden of persuasion at trial."); *SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365, 377 (S.D.N.Y. 2002) (granting summary judgment against SEC in insider

trading case based on contacts between the defendant and a New York law firm handling a tender offer where the lawyer at the New York firm who handled the tender offer denied discussing the acquisition with the defendant, making it "speculative to infer from this contact that [the defendant] acquired inside information").

171.    Most significantly, Reggie, a member of the Florida bar and currently a law clerk with a federal judge, was a credible witness before the Court.  The Court has no reason to doubt his testimony that he understood the importance of keeping confidential information that he learned at work confidential, and that he "compartmentalized" between his work obligations and his family life.

172.    The SEC's attempt to single out isolated contacts with Reggie as suspicious is further undermined when one looks at the full picture.   Credible testimony presented by Reggie and his father establishes that the relationship Dr. Zachariah had with his son Reggie was and continues to be close. Reggie and his father regularly saw each other on weekends and went to church together during the relevant time period.  They spoke to each other on an almost daily basis and sometimes more than once per day.  Cell phone records show that the father and son spoke at least 258 times by phone in the period from January to July 2005.  And the call singled out by the SEC in its Complaint is just one of 39 calls between Reggie and his father in the month of May 2005.  Thus, one could take virtually any action in Dr. Zachariah's daily life, no matter how innocuous, and link it to a recent call or contact with his son – that, however, does not create a "pattern" between the two, unrelated events.

173.    At bottom, the SEC has provided evidence showing, at most, the possibility that non-public information was communicated between father and son.   From this

evidence, the fact finder necessarily would have to speculate to draw any inference of actual possession of inside information by Dr. Zachariah, something courts have been cautioned not to do.

174.    In short, the evidence simply is not sufficient to show that Dr. Zachariah, a prominent cardiologist who has given millions of dollars to charity, who has been appointed to and considered for prominent public service positions, and who has been a devoted father to his sons, would be willing to jeopardize his reputation and his career and put his family in harm's way all for the opportunity to make what was an insignificant profit to him in light of his means at the time.

## D.    CONCLUSION

175.    In conclusion, the Court finds that the SEC has failed entirely to carry its burden of proof on any of its claims that Dr. Zachariah engaged in insider trading in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   After a multi-year investigation of trades in two completely distinct companies, after the investigative testimony and depositions of multiple individuals, and after roughly 12 days of a bench trial, the SEC has introduced no direct evidence that Dr. Zachariah possessed material, non-public information.   True, a civil enforcement action may be based upon circumstantial evidence as well.   However, for every circumstance relied upon by the SEC in this case, there are equally valid and established circumstances that were demonstrated at trial to show that Dr. Zachariah's trades in IVAX and CSC were not based on material, non-public information and were not made with scienter.

176.    Moreover, the circumstantial case presented by the SEC would require the

Court to find multiple, credible witness, including non-party witnesses with no stake in this litigation whatsoever, to have been outright untruthful in their sworn testimony. These witnesses, who include the General Counsel and Chairman of IVAX (Mr. Steven Rubin and Dr. Phil Frost, respectively) and the Chairman and President of GEO (Mr. George Zoley and Mr. Wayne Calabrese, respectively), provided the Court with no basis to make such sweeping negative credibility findings against multiple individuals who are unrelated to Dr. Zachariah and who had no reason to favor one side over the other in this case.

177.   With respect to the IVAX trades, the Court concludes as follows:

■   First, there is considerable dispute as to whether the SEC has improperly added claims regarding the May 4, 2005 purchase that were not included in the Complaint in an effort to expand their claims on the eve of trial. Regardless, however, the SEC's claims regarding the May 4, 2005 purchase are entirely unfounded in any event, because no witness has testified that material, non-public information was disclosed to Dr. Zachariah at a board meeting before the purchase, no evidence has been presented from which it can reasonably be inferred that such material, non-public information was disclosed to Dr. Zachariah before the purchase, no blackout period was imposed after the board meeting, and another director who was at the same meeting bought shares the day after Dr. Zachariah did with no reprucussions.

■   Second, the direct evidence does not support the SECs claim that Dr. Zachariah and Dr. Frost spoke on July 6, 2005 before Dr. Zachariah bought shares that day, and the SEC's theory would require the Court to find that IVAX's General Counsel, Mr. Steven Rubin, was not truthful in his testimony and that Dr. Frost was not truthful with his General Counsel. Moreover, the circumstantial evidence of the telephone toll records is

unreliable at best and is more consistent with the inference that Dr. Frost did <u>not</u> reach Dr. Zachariah on July 6.  On a related note, the Court finds that not only has the SEC failed to come forward with either direct evidence or circumstantial evidence from which it could reasonably be inferred that Dr. Zachariah was in possession of  material, non-public information, but the direct evidence that has been provided has come from the defense and supports Dr. Zachariah's position that he was not in possession of such information

■     Finally, there is no basis to find that Dr. Zachariah acted with the requisite scienter on July 6 in light of the fact that: (a) he called the company's General Counsel both before and after he made the purchase;(b) he fully reported the purchase to the General Counsel; (c) he made no effort to conceal what would be very public trades; (d) he followed the General Counsel's instructions and attempted to unwind the trades; and (e) he even offered to sell the shares at a small loss or transfer them so that he would not benefit from them.

178.   With respect to the CSC trades, the Court concludes as follows:

■     First, there is substantial, credible evidence that Dr. Zachariah's decision to invest in CSC was prompted by conversations with Dr. Robert Ashburn about the company. Dr. Robert Ashburn's testimony, which corroborated Dr. Zachariah's reasons for purchasing the stock, was entirely logical and credible in every respect.

■     Second, even the SEC apparently concedes that some of Dr. Zachariah's purchases were not motivated by insider information, as the SEC has made  no claim that Dr. Zachariah's purchases and sale in March, April and early May 2005 were improper in any way.

■     Third, none of the sources that the SEC claims Dr. Zachariah could have

learned the confidential information from support the SEC's theory.  Everyone from Mr. George Zoley to Mr. Reggie Zachariah testified credibly that Dr. Zachariah had no involvement whatsoever in GEO's acquisition of CSC, and that they did not (and never would) disclose such confidential information to him.

■    Finally, in order to overcome the weakness of the circumstantial evidence it relies upon, the SEC's theory is premised on the notion that multiple witnesses, including non-party witnesses such as Messrs. George Zoley and Robert Ashburn, provided untruthful testimony before the Court. There is simply no basis for doing so.

179.    Any of the foregoing conclusions of law which may represent findings of fact are hereby adopted as findings of fact.

180.    Any and all pending motions are hereby DENIED AS MOOT.

181.    A final judgment consistent with the terms of these Findings of Fact and Conclusions of Law shall be entered in favor of the Defendant Zachariah P. Zachariah and against the Plaintiff the Securities and Exchange Commission.

**DONE AND ORDERED** this 20th day of December, 2010 in Chambers, at West Palm Beach, Florida.


_____
LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE


CC:    The Honorable Kenneth A. Marra
       All Counsel of Record